UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AL HENRY ALLEN,

    Petitioner,

  v.

CDCR,

    Respondent.

No.  2:20-cv-00997 KJM GGH P

FINDINGS AND RECOMMENDATIONS

*Introduction and Summary*

   Petitioner, a state prisoner proceeding pro se, has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254. The matter was referred to the United States Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 302(c).

   The tragic setting for this gang inspired slaying was well put by Presiding Justice Raye of the Third District Court of Appeal, and is worth repeating here:

> The criminal law has special rules for teenagers who are gang members and even for their friends who hang with them. Sadly, gang culture and guns is a deadly combination often claiming young lives and, as here, the lives of those who are not gang members. There is no evidence that defendants Al Henry Allen, Brandon Marcel Washington, or Jahmal Vance Dawson went to a high school graduation party held in a hotel across from a police station in an area of Elk Grove that was not claimed by any gang intending to encounter, let alone shoot and kill, D'Andre Blackwell,

who was not a gang member but had the misfortune of being with two of his friends who were. Having been instructed on the sociology and psychology of gang members during a particularly violent period of time in south Sacramento by a gang expert and on the law of aiding and abetting and the natural and probable consequences doctrine by the trial court following a joint trial, a jury convicted Allen, the shooter, of second degree murder and attempted murder with various enhancements and Washington and Dawson of assault with a deadly weapon and a gang enhancement.

People v. Allen, No. C074260, 2019 WL 4783953, at *1 (Cal. Ct. App. Oct. 1, 2019)

Ultimately, the attempted murder charge was reversed, but petitioner remained convicted of murder. The sole issue in this habeas action is whether the reading at trial of an important eye witness' preliminary hearing testimony, which identified petitioner as the shooter, violated the Confrontation Clause of the Sixth Amendment. This issue was exhaustively analyzed by the Court of Appeal. It's decision to find no violation is more than AEDPA reasonable, and the petition should accordingly be denied.

*The Antiterrorism and Effective Death Penalty Act of 1996 Standards*

    1. Legal Standards

The statutory limitations of the power of federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"). The text of § 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), clearly established federal law consists of holdings of the United States Supreme Court at the time of the last reasoned state court decision. Thompson v. Runnels, 705 F.3d 1089, 1096 (9th Cir. 2013) (citing Greene v. Fisher, 565 U.S. 34, 39 (2011)); Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529

1    U.S. 362, 405-406 (2000)). Circuit precedent may not be "used to refine or sharpen a general

2    principle of Supreme Court jurisprudence into a specific legal rule that th[e] [Supreme] Court has

3    not announced." Marshall v. Rodgers, 569 U.S. 58, 63-64 (2013) (citing Parker v. Matthews, 567

4    U.S. 37, 48 (2012)). Nor may it be used to "determine whether a particular rule of law is so

5    widely accepted among the Federal Circuits that it would, if presented to th[e] [Supreme] Court,

6    be accepted as correct. Id.

7         A state court decision is "contrary to" clearly established federal law if it applies a rule

8    contradicting a holding of the Supreme Court or reaches a result different from Supreme Court

9    precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003).

10   Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the

11   writ if the state court identifies the correct governing legal principle from the Supreme Court's

12   decisions, but unreasonably applies that principle to the facts of the prisoner's case. Lockyer v.

13   Andrade, 538 U.S. 63, 75 (2003); Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004).  In this

14   regard, a federal habeas court "may not issue the writ simply because that court concludes in its

15   independent judgment that the relevant state-court decision applied clearly established federal law

16   erroneously or incorrectly. Rather, that application must also be unreasonable." Williams, supra,

17   529 U.S. at 412. See also Lockyer, supra, 538 U.S. at 75 (it is "not enough that a federal habeas

18   court, 'in its independent review of the legal question,' is left with a 'firm conviction' that the

19   state court was 'erroneous.' ") "A state court's determination that a claim lacks merit precludes

20   federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state

21   court's decision." Harrington v. Richter, 562 U.S. 86, 101 (2011) (quoting Yarborough v.

22   Alvarado, 541 U.S. 652, 664 (2004)). Accordingly, "[a]s a condition for obtaining habeas corpus

23   from a federal court, a state prisoner must show that the state court's ruling on the claim being

24   presented in federal court was so lacking in justification that there was an error well understood

25   and comprehended in existing law beyond any possibility for fairminded disagreement."

26   Harrington, 562 U.S. at 103.

27        The court looks to the last reasoned state court decision as the basis for the state court

28   judgment. Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). "[Section] 2254(d) does not require a

state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.' " <u>Harrington</u>, 562 U.S. at 100 . Rather, "[w]hen a federal claim has been presented to a state court and the state court has denied relief, it may be presumed that the state court adjudicated the claim on the merits in the absence of any indication or state-law procedural principles to the contrary." <u>Id.</u> at 99. This presumption may be overcome by a showing "there is reason to think some other explanation for the state court's decision is more likely." <u>Id.</u> at 99-100. Similarly, when a state court decision on a petitioner's claims rejects some claims but does not expressly address a federal claim, a "federal habeas court must presume (subject to rebuttal) that the federal claim was adjudicated on the merits." <u>Johnson v. Williams</u>, 568 U.S. 289, 293 (2013). When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo.  <u>Stanley</u>, <u>supra</u>, 633 F.3d at 860.

The state court need not have cited to federal authority, or even have indicated awareness of federal authority in arriving at its decision.  <u>Early v. Packer</u>, 537 U.S. 3, 8 (2002). Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d). <u>Stanley</u>, 633 F.3d at 860; <u>Himes v. Thompson</u>, 336 F.3d 848, 853 (9th Cir. 2003). "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable." <u>Id.</u> at 853. Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief." <u>Harrington</u>, <u>supra</u>, 562 U.S. at 98.  A summary denial is presumed to be a denial on the merits of the petitioner's claims. <u>Stancle v. Clay</u>, 692 F.3d 948, 957 & n. 3 (9th Cir. 2012). While the federal court cannot analyze just what the state court did when it issued a summary denial, the federal court must review the state court record to determine whether there was any "reasonable basis for the state court to deny relief." <u>Harrington</u>, 562 U.S. at 98.  This court "must determine what arguments or theories...could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or

4

1    theories are inconsistent with the application was unreasonable requires considering the rule's

2    specificity. The more general the rule, the more leeway courts have in reaching outcomes in case-

3    by-case determinations.' " Id. at 101 (quoting Knowles v. Mirzayance, 556 U.S. 111, 122 (2009)

4    (emphasis added). Emphasizing the stringency of this standard, which "stops short of imposing a

5    complete bar of federal court relitigation of claims already rejected in state court proceedings[,]"

6    the Supreme Court has cautioned that "even a strong case for relief does not mean the state

7    court's contrary conclusion was unreasonable." Id. at 102.

8         2.   Applicability

9         There is no doubt that the federal Sixth Amendment issue was set forth before the

10   California courts, and that it was decided with the identical state issue.  The first appellate brief,

11   to the California Court of Appeal, Third Appellate District ("Court of Appeal"), cited to the Sixth

12   Amendment, and a few federal cases. See ECF No. 13-5. Moreover, the California law discussed

13   by the Court of Appeal relied heavily on federal law as held by the Supreme Court.  See e.g.,

14   People v. Louis, 42 Cal. 3d 969, 982-83 (1986); People v. Roldan, 205 Cal. App. 4th 969-979;

15   980 (2012).  See also ECF No. 11 at 14 n. 3. The petition for review before the California

16   Supreme Court was made expressly for the purpose of exhausting federal issues before that court.

17   See ECF No. 13-15.

18        In all the state briefs, as well as the petition here, the factual findings of the Superior Court

19   and Court of Appeal were not attacked. Rather it was the application of those facts to the law

20   which was at issue. Therefore, the factual findings of the Court of Appeal will be set forth herein

21   as undisputed. The issue for resolution is whether the facts/omissions, as found, would require

22   reasonable jurists to find a Sixth Amendment Confrontation Clause violation.

23   *Discussion*

24        As discussed above, the Court of Appeal exhaustively reviewed this subject both

25   factually, and under state law, which largely mirrors federal law on the subject.  The undersigned

26   sets forth federal case law on the subject.

27              The Sixth Amendment guarantees the right of an accused in a
             criminal prosecution "to be confronted with the witnesses against
28           him." U.S. Const. amend. VI. Nevertheless, the prosecution may

5

1

> introduce the prior testimony of a witness without running afoul of the Sixth Amendment, as long as two criteria are met: "First, the prosecutor must prove that the witness is unavailable to testify at trial. Second, the defendant must have had the opportunity to cross-examine the witness at the prior hearing." *Windham v. Merkle*, 163 F.3d 1092, 1102 (9th Cir.1998); see also *United States v. Inadi*, 475 U.S. 387, 392–94, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986); *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) [overruled on other grounds by *Crawford v. Washington*, 541 U.S. 36, 60 (2004)]. A witness will be deemed "unavailable" only if "the prosecutorial authorities have made a good-faith effort to obtain his presence at trial." *Barber v. Page*, 390 U.S. 719, 724–25, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968)…..

Jackson v. Brown, 513 F.3d 1057, 1082-1083 (9th Cir. 2008).

> "The constitutional requirement that a witness be 'unavailable' before his prior testimony is admissible stands on separate footing that is independent of and in addition to the requirement of a prior opportunity for cross-examination." *United States v. Yida*, 498 F.3d 945, 950 (9th Cir.2007), citing *Barber v. Page*, 390 U.S. 719, 724–25, 88 S.Ct. 1318, 20 L.Ed.2d 255 (1968) (holding that admission of prior testimony violated the Confrontation Clause because the state did not prove the witness was unavailable irrespective of whether the witness was cross-examined during prior testimony)…..

Vinci v. Paramo, No. 13cv1756-BTM (PCL), 2015 WL 5155594, at *4 (S.D. Cal. Sept. 1, 2015).

The prosecution must exercise reasonable diligence to obtain a witness' appearance, but it is not necessary to show that every conceivable measure was taken to secure the appearance.

Windham v. Merkle, 163 F.3d 1092, 1102 (9th Cir. 1998) (citing Barber v. Page, 390 U.S. 719, 724-725 (1968)); see also Vinci, 2015 WL 5155594, at *5 ("The Magistrate Judge correctly noted that 'the deferential standard of review set out in 28 U.S.C. § 2254(d) does not permit a federal court to overturn a state court's decision on the question of unavailability merely because the federal court identifies additional steps that might have been taken.' *Hardy*, 132 S.Ct. at 494.")[1]

The precise words of Hardy, 565 U.S. 65, 71-72 (2011) are worth quoting:

> As we observed in *Roberts*, when a witness disappears before trial, it is always possible to think of additional steps that the prosecution might have taken to secure the witness' presence, *see* 448 U.S., at 75, 100 S.Ct. 2531, but the Sixth Amendment does not require the prosecution to exhaust every avenue of inquiry, no matter how unpromising. And, more to the point, the deferential standard of

---

[1] Hardy v. Cross, 565 U.S. 65 (2011).

review set out in 28 U.S.C. § 2254(d) does not permit a federal court to overturn a state court's decision on the question of unavailability merely because the federal court identifies additional steps that might have been taken. Under AEDPA, if the state-court decision was reasonable, it cannot be disturbed.

Finally, even if a decision is made that the prosecution did not meet its burden in showing the unavailability of the witness, any such error must be scrutinized under the harmless error standard of <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637 (1993), i.e., did the error have a substantial and injurious effect on the verdict. <u>Jackson v. Brown</u>, <u>supra</u>.

The undisputed factual findings regarding unavailability[2] as set forth by the Court of Appeal are as follows:

Shaw reluctantly met with the prosecutor on May 10, 2013, in preparation for his testimony scheduled to begin on May 14. He repeatedly asked the prosecutor to play a videotape of the preliminary hearing rather than making him testify. Although afraid of retaliation, he agreed to testify on May 14. But on the morning set for his testimony, Shaw's mother informed the prosecutor that Shaw was en route to the hospital for anxiety and chest pains and he would not appear at the trial. The prosecutor asked the court to issue a no-bail bench warrant for Shaw and asked his investigator to find him. The prosecutor's investigator testified at length to the attempts he then took to find Shaw and make him available to testify.

On May 14, the investigator spoke to Shaw's mother and tried to locate him at the hospital. He was told he was not there. His mother assured the investigator she would try to find him.

The investigator explained that he began "a process of due diligence, including but not limited to delving into his background, his associates, known locations that he had frequented, people that he had contacted during various periods of confinement with law enforcement, and I began to prepare a Court-ordered request for cell phone information." He researched several public record databases, the Known Persons File in the CJIS system, and the Sacramento Police Department's Versadex system and then cross-checked the data from each system. He came up with a list of people with whom he believed Shaw associated. He solicited the help of the Sacramento County Sheriff's Department warrant and fugitive detail to establish surveillance on a known location, and learned that Shaw had been at that location as recently as that morning.

The investigator spoke to Shaw by telephone at 1:24 p.m. on May 14. He listened to Shaw's concerns about retaliation and explained

---

[2] No one challenges the fact that witness Shaw was available for cross-examination at the preliminary hearing.

the consequences if he failed to appear. Shaw insisted that he needed a week to clear his head. After the investigator told him he could not have an additional week, he said "Come find me," and hung up.

The investigator obtained court ordered cell phone records. Through these records, he was able to locate Shaw's girlfriend's mother, who was very cooperative. By that time, Shaw's mother had become hostile, but her husband had not. The investigator also contacted an account holder of a cell phone Shaw had used to make and receive calls. The account holder was aware that Shaw was evading law enforcement but did not know how to contact him.

Surveillance at four different residences began on May 14: Shaw's girlfriend's house, his mother's house, the cell phone account holder's house, and Shaw's most recent residence. The sheriff's department provided the surveillance during the day and the investigator conducted surveillance of the residences in the evening.

On May 15, the investigator and his partner conducted three hours of surveillance on three residences. He spent additional time with Shaw's girlfriend's mother who told him that Shaw had been at her house on May 14 and a family member had driven Shaw and her daughter to a location near Shaw's mother's house. He also knocked on doors to determine if Shaw was present.

On May 16, the investigator conducted spot-check surveillance of multiple addresses. He drove by the girlfriend's mother's house looking for target vehicles. He checked in again with Shaw's stepfather who had done his best to persuade Shaw to come to court, but did not know where he was. He visited Shaw's mother at her workplace but she would not talk to him. Again he knocked on doors to determine if Shaw was present.

The investigator worked only on this case through Friday, May 17. Although there was no surveillance conducted over the weekend, he continued to monitor other leads, including pin registers. The surveillance was suspended because Shaw was actively evading the investigator and he had stopped using all the telephone numbers he was associated with. His mother was no longer helpful.

At the conclusion of an Evidence Code section 402 hearing, the trial court advised the prosecutor to make further efforts to apprehend Shaw. Those too proved unproductive. The investigator's request for additional investigative support from the sheriff was rejected. None of his contacts had heard from or seen Shaw since May 14. His girlfriend had called her mother and brother on May 19 but refused to disclose her or Shaw's whereabouts. He warned a friend of Shaw's girlfriend not to harbor Shaw or his girlfriend and he had no reason to doubt the friend's cooperative family.

The investigator also requested a call detail search of Shaw's girlfriend's cell phone. He learned that she had called her brother from a phone associated with regions in the Los Angeles San

Fernando Valley. He could not find a match with all the numbers associated with Shaw. Nor could he find the listings of the phone number in public record databases and reverse directories.

Despite the investigator's efforts, defense counsel insisted the prosecution had failed to exercise due diligence to obtain Shaw's presence and the failure to produce him violated their constitutional rights to confrontation. The trial court disagreed.

The trial court explained that the prosecutor was "not required to undertake a marathon, active, be-on-the-lookout, all-points bulletin, no-resources-to-be-spared effort to bring in the witness." The court acknowledged that more could always be done. But this was not a case of mere "box checking," a hollow gesture to demonstrate diligence. Rather, the investigator, on the prosecution's behalf, "made an energetic effort, virtually nonstop for about a week, obtaining court orders as necessary, working with other district attorney personnel and other law enforcement of the allied agency personnel" to find Shaw. Indeed, in the court's view, there was a "genuine, energetic, vigorous effort" to obtain Shaw's presence. When requesting the bench warrant on the day Shaw absconded, the prosecutor ensured that Shaw could not be released prior to appearing in court if he was arrested. The court concluded the prosecution had "seriously exercised all reasonable and even some additional efforts" to find Shaw. Because the prosecution had exercised due diligence in securing Shaw's attendance, the witness was unavailable for purposes of the confrontation clause and the preliminary hearing testimony could be read to the jury.

Defendants point to a number of alleged flaws and omissions in the prosecution's efforts to find Shaw. Most serious was stopping the search for three days. But defendants also contend that Shaw's disappearance was predictable; he was a substantial flight risk. He had expressed repeated reluctance to testify and a genuine fear of retaliation. Anyone familiar with gang culture was aware that snitching was taboo and Shaw had testified against, not only a fellow gang member, but someone he had come to regard as family. Defendants insist Shaw's testimony was vital and his credibility was suspect. Therefore, they propose a number of precautions the prosecution should have taken including independently verifying his address when he met with the prosecutor on May 10, keeping him under surveillance until he testified, and/or detaining him under the "material witness" provision of section 1332.

People v. Allen, supra, 2019 WL 4783953, at *4-6.

Citing primarily to state case law for comparison purposes, the Court of Appeal found that the efforts here by the prosecution met or exceeded those efforts in which the cited cases did not find a lack of good faith and diligence. In this habeas action, petitioner bears the burden of demonstrating that under applicable United States Supreme Court authority, reasonable jurists could not find that the efforts in this case were sufficient. Petitioner does no more than attach the

1   brief on Petition for Review before the California Supreme Court.  Petitioner does not in that

2   brief, or even in the brief before the Court of Appeal, cite to any federal Supreme Court case

3   whose facts would clearly indicate that the efforts undertaken here were not sufficient, much less

4   AEDPA unreasonable.

5          The focus of decision here is the Court of Appeal opinion, and it is set forth at length in

6   Appendix A to this Findings and Recommendations insofar as it deals with the Confrontation

7   Clause.  In that lengthy analysis, the Court of Appeal compared and contrasted the facts of several

8   state cases.  However, the summary of its analysis is provided below:

> In short, we conclude the prosecution exercised reasonable
> diligence in attempting to locate Shaw and make him available to
> testify at the trial. The prosecution had met with him a mere four
> days before his scheduled testimony and impressed on him the
> importance of following through with the terms of his agreement.
> After all, he had been facing a life term before negotiating a
> favorable agreement and had been released on his own
> recognizance. The prosecutor reasonably believed that, since he had
> already testified at the preliminary hearing and would be exposed to
> the life term if he failed to appear at trial, there was little risk he
> would jeopardize his freedom and risk a life in prison by
> absconding. Given the herculean efforts exerted by the investigator
> just as soon as the prosecution was alerted that Shaw was en route
> to the hospital instead of the courthouse, efforts that continued for
> five days, and the additional effort the investigator made at the
> court's request just before the trial commenced, we agree with the
> trial court that Shaw was unavailable for trial because the
> prosecution had exercised due diligence and, therefore, allowing his
> testimony provided at the preliminary hearing to be read did not
> violate defendants' constitutional right to confrontation.

20   People v. Allen, 2019 WL 4783953, at *7.

21          The undersigned has reviewed the federal cases cited in the discussion above but is

22   unwilling to become petitioner's attorney in a vain attempt to compare and contrast all federal

23   authority—no matter how factually dissimilar. Nor will the undersigned engage in a critique of

24   the Court of Appeal's analysis of state cases.  However, the undersigned has reviewed the facts of

25   Hardy, 565 U.S. 65, and Jackson, 513 F.3d 1057, cited previously, and has attached those facts to

26   Appendix A as well.  The undersigned cannot declare the Court of Appeal AEDPA unreasonable

27   when comparing the facts of those cases to the one at bar.

28   ////

1        Suffice it to say here that certain facts stand out in this case which are dispositive in favor

2    of respondent.  First, this was not a case where the prosecution knew that Shaw had been on the

3    run for some time—indeed, as stressed by the Court of Appeal, the prosecutor had met with Shaw

4    just a few days before trial.  Many witnesses in Shaw's position would be reluctant to testify, but

5    such reluctance does not automatically require round-the-clock surveillance.  Shaw had in no way

6    threatened not to show up for trial at the time.

7        Secondly, as stressed by the Court of Appeal, Shaw was not a witness who had nothing to

8    lose by not showing up to testify.  While one could argue that the aiding and abetting murder

9    charges against Shaw were "prosecutor bluff," i.e., Shaw's testimony reveals that he was as taken

10   aback as anyone that petitioner had actually used a weapon to quell a spontaneous argument, i.e.,

11   there had been no specific pre-party evidence pointing towards petitioner's desire to shoot

12   someone, or that the precise combatants would even be at the graduation party. The fact remains

13   that Shaw was charged and he did make a plea deal with the prosecution to forever be relieved of

14   those life imprisonment charges in return for truthful testimony. Shaw had spent several months

15   in custody—he certainly knew that he was involved in a very serious situation. Shaw benefitted

16   greatly by the plea deal.  It would not be expected by the prosecution that in these circumstances,

17   especially after Shaw had testified at the preliminary hearing in partial fulfillment of the plea

18   deal, that Shaw was likely not to show up at trial such that preventative measures, probably

19   detention measures in violation of the plea agreement, should have been employed. While Shaw's

20   absence was not out of the realm of possibility, there are limits to which the prosecution must

21   foresee every theoretical possibility that a witness would get cold feet resulting in flight,

22   especially if such cold feet might resurrect life imprisonment charges.  Moreover, due to Shaw's

23   testimony at the preliminary hearing, the "snitch" taboo was out of the bag and into the open.

24   Testimony, or non-testimony, at trial would do little to place the snitch reputation back in the bag.

25   There was always the possibility, indeed probability, that the preliminary hearing testimony

26   would be utilized in some fashion, if only for impeachment, assuming that Shaw did show up at

27   trial.  The preliminary hearing testimony, while not the "ballgame," placed petitioner far behind

28   in the late innings.  Shaw's disappearance after the preliminary hearing was less likely given

1   these facts as any absolution by petitioner or his gang would probably never be forthcoming. In a

2   sense, Shaw had less to lose or little more to lose, vis-à-vis gang relations, by testifying at trial

3   than he did by testifying at the preliminary hearing. When it appeared, nevertheless, that Shaw

4   might do the irrational by fleeing trial testimony requirements, the prosecutor set about right away

5   to attempt to nip the cold feet in the bud. Surely, in hindsight, more law enforcement forces could

6   have been brought to bear in finding Shaw; but the state courts after a lengthy, good faith

7   analysis, found that such extra efforts were not required.  The undersigned knows of no

8   authoritative United States Supreme Court cases in situations with facts similar to those here

9   which would make the state court's analysis AEDPA unreasonable.

10      But even if the undersigned were in error, the undersigned cannot find that the reading of

11   Shaw's preliminary hearing testimony had a <u>Brecht</u> substantial and injurious effect on the verdict.

12   This would not have been the case if Shaw was the only witness who identified petitioner as the

13   shooter.  While there was much evidence as to what happened—the shooting—there were only

14   two witnesses who identified petitioner as the shooter, and only one other witness who saw

15   petitioner armed at some point in the evening.  If Shaw had been the only witness to identify

16   petitioner as the shooter, his testimony would have been critical.

17      But, as set forth above Shaw was not the only witness to identify petitioner as the shooter.

18   Isaevion Anderson, associated with the group in which petitioner was a member, and whose

19   testimony begins at ECF No. 12-13 at 120, saw petitioner flash his weapon on entering the

20   Holiday Inn that evening.  ECF No. 12-13 at 155-156.   In describing the scene just prior to the

21   shooting, Anderson then testified, "That's when Allen fired his gun." <u>Id.</u> at 181-182. He repeated

22   that Allen had fired once.  <u>Id.</u> at 185.

23      Shaw did little in his preliminary hearing testimony to supplement what Anderson stated.

24   The basic thrust of Shaw's testimony was that Allen had fired once into the stairwell. ECF No.

25   12-14 at 124-125, 176.  It is true that Shaw also recounted a later admission by petitioner that he

26   (Allen) had shot because the fleeing gang members had "disrespected" him, <u>id.</u> at 137, but the

27   preeminent testimony described the shooting itself and who did it.

28      For all of the above stated reasons, petitioner's confrontation claim should be denied.

*Conclusion*

Pursuant to Rule 11 of the Federal Rules Governing Section 2254 Cases, this court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate of appealability may issue only "if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). For the reasons set forth in these findings and recommendations, a substantial showing of the denial of a constitutional right has not been made in this case.

Accordingly, IT IS HEREBY RECOMMENDED that:

1. The habeas petition should be DENIED; and

2. The District Court decline to issue a certificate of appealability.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections shall be served and filed within fourteen days after service of the objections.  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

Dated: January 12, 2021

/s/ Gregory G. Hollows
UNITED STATES MAGISTRATE JUDGE

13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**APPENDIX A**

**Opinion by the Court of Appeal on the Confrontation Issue**

2019 WL 4783953
Not Officially Published
(Cal. Rules of Court, Rules 8.1105 and 8.1110, 8.1115)
Only the Westlaw citation is currently available.

California Rules of Court, rule 8.1115, restricts citation of unpublished opinions in California courts.

Court of Appeal, Third District, California.

**The PEOPLE, Plaintiff and Respondent,**
**v.**
**Al Henry ALLEN et al., Defendants and Appellants.**

C074260
|Filed 10/01/2019

(Super. Ct. No. 11F01080)

**Attorneys and Law Firms**

Darren K. Indermill, Office of the Attorney General, P.O. Box 944255, Sacramento, CA 94244-2550, for Plaintiff and Respondent.

Marcia Clark, Attorney at Law, 4831 Las Virgenes Road, #180, Calabasas, CA 91302, Roberta Simon, Attorney at Law, P.O. Box 10728, Oakland, CA 94610, Karriem Jamaal Baker, Attorney at Law, 404 Natoma Street, Folsom, CA 95630, for Defendants and Appellants.

**Opinion**

RAYE, P.J.

**\*1** The criminal law has special rules for teenagers who are gang members and even for their friends who hang with them. Sadly, gang culture and guns is a deadly combination often claiming young lives and, as here, the lives of those who are not gang members. There is no evidence that defendants Al Henry Allen, Brandon Marcel Washington, or Jahmal Vance Dawson went to a high school graduation party held in a hotel across from a police station in an area of Elk Grove that was not claimed by any gang intending to

15

encounter, let alone shoot and kill, D'Andre Blackwell, who was not a gang member but had the misfortune of being with two of his friends who were. Having been instructed on the sociology and psychology of gang members during a particularly violent period of time in south Sacramento by a gang expert and on the law of aiding and abetting and the natural and probable consequences doctrine by the trial court following a joint trial, a jury convicted Allen, the shooter, of second degree murder and attempted murder with various enhancements and Washington and Dawson of assault with a deadly weapon and a gang enhancement.

This case raises many of the troubling issues that arise in gang cases, which routinely rely so heavily on gang expert testimony. Some of the defendants' meritorious arguments require reversal of various counts and others are harmless under the appropriate standards of review. Others are without merit. In brief, we conclude:

1. Allen's conviction for attempted murder must be reversed because the second victim was not in the direct line of fire as the victim who was killed with a single shot.

2. Washington's conviction for assault with a firearm, and the accompanying gang enhancement, must be reversed for insufficiency of the evidence.

3. Dawson's case must be transferred to the juvenile court for a fitness hearing because he was 17 years old at the time of the shooting.

4. Minor corrections must be made to the abstract of judgment regarding Allen's sentence.

5. In all other respects, the judgment is affirmed.[3]

**FACTS**

**The Prosecution's Case**

*The Gang Scene in June of 2010:* The prosecutor called a gang expert to tutor the jury on all things gang related. Included in the tutorial was an explanation of the explosion of violence between rival gangs from late 2007 until the time of the shooting in June 2010. During that time period there had been 26 shootings, including five homicides. The shootings were almost all committed in groups. The allegiances pitted G-MOBB, Guttah Boys, and Starz against their enemies Gunz Up, Oak Park Underworld Zilla, Oak Park Bloods, Fourth Avenue Bloods, FAB Zilla, and Ridezilla. The expert opined that, during this time, gang members understood the unspoken policy to shoot their enemies on sight.

**\*2** *The Scene of the Crime:* On June 5, 2010, large numbers of teenagers had gathered at

---

[3] Fn. 1 in original text has been omitted.

16

the Holiday Inn in Elk Grove for multiple, and ostensibly, wholesome purposes. A recent high school graduate was hosting a graduation party. Once posted on social media, the party attracted scores of teenagers the host did not know. High school cheerleaders, engaged in a cheerleading competition, were also staying at the hotel. As groups of young men entered the hotel to party, the cheerleaders opened their doors and lobbied their coach and chaperones to allow them to join in the fun.

*The Victims:* D'Andre Blackwell, the decedent, was not affiliated with any criminal street gang. Rakeem Collins, a member of Oak Park Underworld Zilla, spent several months at the Boys' Ranch with Allen, a validated member of Guttah Boys. There was no personal animosity between them. Leon Macafee was a member of Gunz Up. On the night Blackwell was shot, Macafee was wearing a sweater with the photograph of one of his friends, another Gunz Up gang member who was killed by G-MOBB and Starz gang members, and the insignia, "GIP" for gun in peace. All three victims were unarmed.

Blackwell, Collins, Macafee, and Omariyea Boughton rode together to the Holiday Inn party. Collins testified they went to the party merely to pick up an I.D. from a friend he could use to get into a club. As soon as they walked into the hotel, they were asked where they were from and, when Collins responded he was from Oak Park, someone said something like "You know it ain't good." They started down a hallway looking for an elevator to take to the party. Collins estimated that a group of 20 to 30 teenage boys blocked their way, whereas Macafee estimated there were between 10 to 15 rival gang members who approached them; both testified the group began to disrespect them by chanting "Gunz down," "Gas them niggas," and "Bust the niggas." An argument ensued. Collins responded, "You got me fucked up." At that point, he saw at least five guns come out. Macafee could see that two of the boys held guns tucked in their clothing, one of which was a revolver, and a third grabbed his waistband as if he had a fairly big gun like a .40 caliber.

At the end of the hallway, there were two doors; one an exit and the other a door to a staircase. Macafee believed it was too dangerous to exit the hotel because the gang bangers would feel free to shoot. While opening the staircase door, he shouted, "F you, niggas. Let's go." He ducked into the staircase, followed by Blackwell and then Collins. Just as Collins turned to close the door, he saw a silver revolver held by an African-American hand and then he heard a single gunshot. Collins and Macafee both testified they did not see who fired the shot. They ran up to the third floor, but then Blackwell, who was bleeding, collapsed and died. The bullet had struck him in the back. Neither Collins nor Macafee identified any of the defendants as present on the night of the shooting. Macafee, however, testified that Collins told him that Allen was the shooter.

*The Accomplices:* The prosecution's case rested primarily on the testimony of three

17

accomplices—Raymond Shaw, Isaevion Anderson, and Kionte Lightner. All three initially had lied to the police. All three received favorable agreements with the prosecution in exchange for their truthful testimony. Shaw, however, breached his agreement. He testified, and was subject to searing cross-examination, during the preliminary hearing. He later absconded and was unavailable to testify at the trial. We recite the facts related to the prosecution's efforts to obtain his presence in the body of the opinion addressing the defendants' collective challenge to the admissibility of his testimony. Without question, Shaw's testimony was the most damning, particularly for Allen.

**\*3** Shaw and Allen were very close, having grown up with each other. Shaw, a Guttah Boys gang member, accompanied 10 friends to the Holiday Inn on June 5, 2010, and observed the argument between rival gang members. He recounted a basic chronology consistent with the victims' testimony. But, whereas they were unable or unwilling to implicate the defendants, Shaw was not. He identified Allen as the shooter. A couple of days after the shooting, he asked Allen why he had shot Blackwell. Allen laughed and explained that the boy had "disrespected" him. Shaw testified that Washington and Allen were in the front of the group, with Dawson close by. Dawson and Anderson taunted Macafee and his friends with slogans such as "Gunz down." The two groups were yelling back and forth and he heard Macafee saying, "Fuck Guttah." He did not see any weapons or flash any gang signs. According to Shaw, Allen was so high on cocaine, anything could have made him shoot. When the group reconvened at a gas station, Washington asked Shaw why Allen had fired a shot. Shaw said he did not know why.

Anderson also received a deal in exchange for his cooperation and testimony. Anderson, a member of the Guttah Boys gang, testified that most of the members of the group that gathered at his apartment complex before caravanning to the hotel party were affiliated with Guttah/Starz subsets. He admitted to concealing a gun in his waist because he did not want to be caught unarmed by any of his enemies in FAB and Gunz Up. He also testified he saw Allen carrying a revolver.

When Anderson and his friends entered the hotel, they encountered a group of three and he recognized Macafee, a member of Gunz Up, as one of the three. Macafee had his hand in his sweater acting like he had a gun. According to Anderson, Macafee said, "Fuck Guttah." He, and others, replied, "Gunz down."

Macafee's group walked away down the hallway. The Guttah Boys group pursued them. Anderson, Allen, and Dawson, Anderson testified, were at the front of the group. The two groups continued to argue, disrespecting each other. As Macafee disappeared into a staircase, followed by his two friends, Anderson saw Allen reach out his arm and fire once.

Kionte Lightner was the third accomplice to incriminate Allen and Washington. Washington took him to Anderson's apartment so he could retrieve his gun but he left it in the car before entering the hotel. He testified he saw a black handle sticking out of Allen's pocket before they left the apartment.

*The Rap Video:* Washington, Allen, and Dawson appeared in a rap video performed by Starz member Lavish D filmed earlier on the day of the shooting. In the video, the participants are seen disrespecting Gunz Up.

*The Gang Expert:* The expert provided the jury with the customary background on criminal street gangs in Sacramento, including the names of the gangs, the rivalries, the crucial importance of respect, the significance of hand signs and tattoos, the predicate offenses, the primary activities of the gangs involved, and how and why potential gang members put in work for their gang. In short, the expert tried, as gang experts always do, to give the jurors an insight into the mindset of gang members and an understanding of the psychology and sociology informing gang behavior. He opined that the shooting was committed for the benefit of and in association with the G-MOBB, Starz, and Guttah Boys gangs.

Where this particular expert veered off course, in defendants' view, is when he opined on a nonexistent "shoot on sight" policy and related case-specific hearsay to support his opinion that each of the defendants was a gang member. We elaborate on this testimony in addressing defendants' objections to the expert's opinions.

*Defenses:* Dawson presented no witnesses in his defense. Washington presented evidence that he vacationed with members of Gunz Up after the shooting. Allen testified on his own behalf. He denied shooting Blackwell. He could not remember what anyone said and he denied that he or any of his friends had a gun. He did not see who shot Blackwell because he was looking at Washington who was talking on his cell phone.

## DISCUSSION
### *Right to Confrontation*
### I

**\*4** Fundamental to our constitutional notion of a fair trial is the right to confront and cross-examine witnesses against a criminal defendant. (U.S. Const., 6th Amend.; Cal. Const., art. I, § 15; Pen. Code, § 686;[2] *People v. Louis* (1986) 42 Cal.3d 969, 982-983.) Defendants assert their most cherished right of confrontation was abridged when they did not have the opportunity to cross-examine Raymond Shaw, a material, and they argue, vital witness for the prosecution. Instead, when Shaw failed to appear for trial, the court allowed the prosecution to read a transcript of Shaw's testimony during the preliminary

hearing. They insist that the egregious nature of the constitutional transgression requires nothing less than reversal of the judgments.

Even a right as sacred as the right to confront and cross-examine is not absolute. (*Chambers v. Mississippi* (1973) 410 U.S. 284, 295 [93 S.Ct. 1038].) Testimonial statements may be admissible if the declarant is unavailable and the defendant has had a prior opportunity to cross-examine. (*Crawford v. Washington* (2004) 541 U.S. 36, 59 [124 S.Ct. 1354] (*Crawford*).) "Evidence Code section 1291 codifies this traditional exception. [Citation.] When the requirements of Evidence Code section 1291 are met, 'admitting former testimony in evidence does not violate a defendant's right of confrontation under the federal Constitution. [Citation.]' " (*People v. Wilson* (2005) 36 Cal.4th 309, 340.)

"Evidence Code section 1291, subdivision(a)(2), provides that former testimony is not rendered inadmissible as hearsay if the declarant is 'unavailable as a witness,' and '[t]he party against whom the former testimony is offered was a party to the action or proceeding in which the testimony was given and had the right and opportunity to cross-examine the declarant with an interest and motive similar to that which he has at the hearing.' In turn, Evidence Code section 240, subdivision(a)(5), states a declarant is 'unavailable as a witness' if the declarant is '[a]bsent from the hearing and the proponent of his or her statement has exercised reasonable diligence but has been unable to procure his or her attendance by the court's process." (*People v. Wilson, supra*, 36 Cal.4th at p. 341.)

The courts have not divined a mechanical definition for reasonable or due diligence. It does connote " 'preserving application, untiring efforts in good earnest, efforts of a substantial character.' " (*People v. Cromer* (2001) 24 Cal.4th 889, 904.) "Considerations relevant to the due diligence inquiry 'include the timeliness of the search, the importance of the proffered testimony, and whether leads of the witness's possible location were competently explored.' " (*People v. Herrera* (2010) 49 Cal.4th 613, 622.) The prosecution bears the burden of proving due diligence in attempting to secure a witness's attendance at trial. (*People v. Roldan* (2012) 205 Cal.App.4th 969, 979.)

In some instances, the prosecution has the burden not only to find a material witness after he or she disappears, but to prevent the witness from fleeing. To trigger this additional burden to take adequate preventative measures to stop the witness from disappearing, the prosecutor must have knowledge of a substantial risk the witness will flee and the witness's testimony is critical or vital to the prosecutor's case. (*People v. Friend* (2009) 47 Cal.4th 1, 68; *People v. Louis, supra*, 42 Cal.3d at pp. 989-991.)

Shaw reluctantly met with the prosecutor on May 10, 2013, in preparation for his testimony scheduled to begin on May 14. He repeatedly asked the prosecutor to play a videotape of the preliminary hearing rather than making him testify. Although afraid of retaliation, he agreed to testify on May 14. But on the morning set for his testimony, Shaw's mother informed the prosecutor that Shaw was en route to the hospital for anxiety and chest pains and he would not appear at the trial. The prosecutor asked the court to issue a no-bail bench warrant for Shaw and asked his investigator to find him. The prosecutor's investigator testified at length to the attempts he then took to find Shaw and make him available to testify.

**\*5** On May 14, the investigator spoke to Shaw's mother and tried to locate him at the hospital. He was told he was not there. His mother assured the investigator she would try to find him.

The investigator explained that he began "a process of due diligence, including but not limited to delving into his background, his associates, known locations that he had frequented, people that he had contacted during various periods of confinement with law enforcement, and I began to prepare a Court-ordered request for cell phone information." He researched several public record databases, the Known Persons File in the CJIS system, and the Sacramento Police Department's Versadex system and then cross-checked the data from each system. He came up with a list of people with whom he believed Shaw associated. He solicited the help of the Sacramento County Sheriff's Department warrant and fugitive detail to establish surveillance on a known location, and learned that Shaw had been at that location as recently as that morning.

The investigator spoke to Shaw by telephone at 1:24 p.m. on May 14. He listened to Shaw's concerns about retaliation and explained the consequences if he failed to appear. Shaw insisted that he needed a week to clear his head. After the investigator told him he could not have an additional week, he said "Come find me," and hung up.

The investigator obtained court ordered cell phone records. Through these records, he was able to locate Shaw's girlfriend's mother, who was very cooperative. By that time, Shaw's mother had become hostile, but her husband had not. The investigator also contacted an account holder of a cell phone Shaw had used to make and receive calls. The account holder was aware that Shaw was evading law enforcement but did not know how to contact him.

Surveillance at four different residences began on May 14: Shaw's girlfriend's house, his mother's house, the cell phone account holder's house, and Shaw's most recent residence. The sheriff's department provided the surveillance during the day and the investigator conducted surveillance of the residences in the evening.

On May 15, the investigator and his partner conducted three hours of surveillance on three residences. He spent additional time with Shaw's girlfriend's mother who told him that Shaw had been at her house on May 14 and a family member had driven Shaw and her daughter to a location near Shaw's mother's house. He also knocked on doors to determine if Shaw was present.

On May 16, the investigator conducted spot-check surveillance of multiple addresses. He drove by the girlfriend's mother's house looking for target vehicles. He checked in again with Shaw's stepfather who had done his best to persuade Shaw to come to court, but did not know where he was. He visited Shaw's mother at her workplace but she would not talk to him. Again he knocked on doors to determine if Shaw was present.

The investigator worked only on this case through Friday, May 17. Although there was no surveillance conducted over the weekend, he continued to monitor other leads, including pin registers. The surveillance was suspended because Shaw was actively evading the investigator and he had stopped using all the telephone numbers he was associated with. His mother was no longer helpful.

**\*6** At the conclusion of an Evidence Code section 402 hearing, the trial court advised the prosecutor to make further efforts to apprehend Shaw. Those too proved unproductive. The investigator's request for additional investigative support from the sheriff was rejected. None of his contacts had heard from or seen Shaw since May 14. His girlfriend had called her mother and brother on May 19 but refused to disclose her or Shaw's whereabouts. He warned a friend of Shaw's girlfriend not to harbor Shaw or his girlfriend and he had no reason to doubt the friend's cooperative family.

The investigator also requested a call detail search of Shaw's girlfriend's cell phone. He learned that she had called her brother from a phone associated with regions in the Los Angeles San Fernando Valley. He could not find a match with all the numbers associated with Shaw. Nor could he find the listings of the phone number in public record databases and reverse directories.

Despite the investigator's efforts, defense counsel insisted the prosecution had failed to exercise due diligence to obtain Shaw's presence and the failure to produce him violated their constitutional rights to confrontation. The trial court disagreed.

The trial court explained that the prosecutor was "not required to undertake a marathon, active, be-on-the-lookout, all-points-bulletin, no-resources-to-be-spared effort to bring in the witness." The court acknowledged that more could always be done. But this was not a case of mere "box checking," a hollow gesture to demonstrate diligence. Rather, the

investigator, on the prosecution's behalf, "made an energetic effort, virtually nonstop for about a week, obtaining court orders as necessary, working with other district attorney personnel and other law enforcement of the allied agency personnel" to find Shaw. Indeed, in the court's view, there was a "genuine, energetic, vigorous effort" to obtain Shaw's presence. When requesting the bench warrant on the day Shaw absconded, the prosecutor ensured that Shaw could not be released prior to appearing in court if he was arrested. The court concluded the prosecution had "seriously exercised all reasonable and even some additional efforts" to find Shaw. Because the prosecution had exercised due diligence in securing Shaw's attendance, the witness was unavailable for purposes of the confrontation clause and the preliminary hearing testimony could be read to the jury.

Defendants point to a number of alleged flaws and omissions in the prosecution's efforts to find Shaw. Most serious was stopping the search for three days. But defendants also contend that Shaw's disappearance was predictable; he was a substantial flight risk. He had expressed repeated reluctance to testify and a genuine fear of retaliation. Anyone familiar with gang culture was aware that snitching was taboo and Shaw had testified against, not only a fellow gang member, but someone he had come to regard as family. Defendants insist Shaw's testimony was vital and his credibility was suspect. Therefore, they propose a number of precautions the prosecution should have taken including independently verifying his address when he met with the prosecutor on May 10, keeping him under surveillance until he testified, and/or detaining him under the "material witness" provision of section 1332. We turn to an exemplar of cases for guidance, mindful of our duty to independently review the trial court's ruling. (*People v. Cromer, supra*, 24 Cal.4th at p. 901.)

The California Supreme Court upheld a finding of due diligence in *People v. Wilson* (2005) 36 Cal.4th 309 (*Wilson*), on facts far less favorable to the prosecution. In *Wilson*, a criminal conviction was reversed while a material witness was in prison or had been recently released. (*Id.* at p. 341.) A few months before the retrial, a detective tried for two days to locate the witness including visiting his last known address, attempting to locate his known associates, and checking police, county, and state records with the 15 different names he had used. (*Id.* at pp. 341-342.) The detective could not find him. (*Ibid.*) Like defendants in the case before us, the defense outlined a list of prosecutorial should haves. The defense argued that once the judgment was reversed, the prosecution should have contacted and monitored him, should have contacted his family, should have checked with the post office for his forwarding address, should have followed up with his visitors in prison, and should have determined whether he was a party in any civil actions. (*Ibid.*) Having failed to take any of these additional steps, the defense maintained that the prosecution failed to exercise due diligence.

**\*7** The Supreme Court disagreed. "The prosecution is not required 'to keep "periodic

tabs" on every material witness in a criminal case ....' [Citation.] Also, the prosecution is not required, absent knowledge of a 'substantial risk that this important witness would flee,' to 'take adequate preventative measures' to stop the witness from disappearing." (*Wilson, supra*, 36 Cal.4th at p. 342.) The court concluded, " 'That additional efforts might have been made or other lines of inquiry pursued does not affect this conclusion. [Citation.] It is enough that the People used reasonable efforts to locate the witness.' " (*Ibid.*)

The efforts made by the prosecution's investigator in this case were even more exhaustive than those exerted by the detective in *Wilson*. He worked exclusively on tracking down Shaw for five days. He solicited the help of the sheriff's department to conduct surveillance at several locations. He obtained a voluminous amount of cell phone records. He spoke to Shaw's friends and family repeatedly. The prosecution immediately obtained a bench warrant as soon as it was informed that Shaw would not be present on the first full day of trial. In addition, the investigator secured the help of other law enforcement agencies. The fact that he suspended the active surveillance for three days, while continuing to monitor the cell phones, does not transmute a diligent and persistent search into a lackluster and constitutionally insufficient one. Rather, we agree with the trial court that the investigator's efforts were robust, or in its words, "genuine, energetic, vigorous."

There is no need to dissect the facts of each of the cases cited by defendants illustrating prosecutorial lack of due diligence. Suffice it to say, the facts are easily distinguished. For example, in *People v. Roldan* (2012) 205 Cal.App.4th 969, the prosecution knew, but did not disclose to the defense or take a single precautionary step, that a material witness would be deported at the conclusion of the preliminary hearing. The prosecution did not impress on the witness the importance of staying in touch with investigators; nor did it seek a section 1332 material witness hold. Needless to say, the prosecution was well aware the material witness would be unavailable for trial and yet it sat idle.

In *People v. Louis, supra*, 42 Cal.3d 969, there was no witness whose testimony was more critical to the prosecution's case and no witness whose credibility was more suspect. In fact, he provided the sole evidence identifying the defendant as the trigger man. (*Id.* at p. 989.) Defendants would have us cast Shaw in a similar vein. It is true that Shaw was an important witness for the prosecution and his identification was particularly damning. But he was not the only witness to identify Allen as the shooter or Dawson as an active participant. Anderson's testimony paralleled Shaw's in all important respects and Allen, according to Macafee, told Collins he had shot Blackwell. Nearly all of the percipient witnesses were gang members and most of them had accepted favorable dispositions from the prosecution in exchange for their testimony. Thus, Shaw's credibility was no more suspect than many of the other witnesses who testified at trial.

24

In short, we conclude the prosecution exercised reasonable diligence in attempting to locate Shaw and make him available to testify at the trial. The prosecution had met with him a mere four days before his scheduled testimony and impressed on him the importance of following through with the terms of his agreement. After all, he had been facing a life term before negotiating a favorable agreement and had been released on his own recognizance. The prosecutor reasonably believed that, since he had already testified at the preliminary hearing and would be exposed to the life term if he failed to appear at trial, there was little risk he would jeopardize his freedom and risk a life in prison by absconding. Given the herculean efforts exerted by the investigator just as soon as the prosecution was alerted that Shaw was en route to the hospital instead of the courthouse, efforts that continued for five days, and the additional effort the investigator made at the court's request just before the trial commenced, we agree with the trial court that Shaw was unavailable for trial because the prosecution had exercised due diligence and, therefore, allowing his testimony provided at the preliminary hearing to be read did not violate defendants' constitutional right to confrontation.

People v. Allen, 2019 WL 4783953, at *1-7.

25

**Facts in <u>Hardy v. Cross</u>, 565 U.S. 65, 66-67 (2011)**

The State represented that A.S. had said after the first trial that she was willing to testify at the retrial. The State said that it had remained in "constant contact" with A.S. and her mother and that "[e]very indication" had been that A.S., "though extremely frightened, would be willing to again come to court and testify." Record, Exh. J, p. 111 (hereinafter Exh. J). On March 3, however, A.S.'s mother and brother told the State's investigator that they did not know where she was, and A.S.'s mother reported that A.S. was "very fearful and very concerned" about testifying again. Record, Exh. K, p. E–9 (hereinafter Exh. K); *id*., at E–14. On March 9 or 10, the investigator interviewed *67 A.S.'s father, who also had "no idea where [A.S.] was." *Id*., at E–12. The father's only suggestion was to refer the investigator back to the mother.

On March 10, the State learned from A.S.'s mother that A.S. had run away from home the day before and had not returned.* Exh. J, at 111. Thereafter, "efforts began by members of the Cook County State's Attorney's Office and by law enforcement personnel to locate" A.S. *Id*., at 112. The State averred that its efforts included the following:

> "Constant personal visits to the home of [A.S.] and her mother, at all hours of the day and night. This is where the victim has lived since the sexual assault occurred.

>> "Personal visits to the home of [A.S.'s] father. This is where the victim lived when the sexual assault occurred.

>> "Personal conversations, in English and in Spanish, with the victim's mother, father, and other family members.

>> "Telephone calls, in English and in Spanish, to the victim's mother, father, and other family members.

>> "Checks at the Office of the Medical Examiner of Cook County.

>> "Checks at local hospitals.

>> "Checks at the Cook County Department of Corrections.

>> "Check at the victim's school.

>> "Check with the family of an old boyfriend of the victim.

26

"Check with the Illinois Secretary of State's Office.

"[Department of] Public [A]id check." *Id*., at 112–113.

The State also inquired at the Department of Public Health, the morgue, the Cook County Jail, the Illinois Department *68 of Corrections, the Immigration Department, and the post office. See Exh. K, at E–14 to E–17, E–21; App. to Pet. for Cert. 18a. The State's investigator was assisted in the search by a police detective and a victim's advocate. The detective visited A.S.'s father's home once and went to A.S.'s mother's home—A.S.'s last-known residence—on numerous occasions, approximately once every three days, at different hours of the day and night. Exh. K, at E–27 to E–29, E–35. On one visit, A.S.'s mother told the victim's advocate **493 that A.S. could be staying with an ex-boyfriend in Waukegan, Illinois, 40 miles away. *Id*., at E–42 to E–43. The police detective visited the Waukegan address but was informed by the ex-boyfriend's mother that she had not seen A.S. in several months and that A.S. was not staying with her or her son. *Id*., at E–33 to E–34. The efforts to find A.S. continued until March 28, the day of the hearing on the State's motion. *Id*., at E–30.

On a final visit to A.S.'s mother on the morning of March 28, the mother informed the police detective that A.S. had called approximately two weeks earlier and had said that she did not want to testify and would not return to Chicago. See *id*., at E–30; 632 F.3d 356, 359 (C.A.7 2011). A.S.'s mother told the detective that she still did not know where A.S. was or how to contact her. Exh. K, at E–30.

27

**Facts in <u>Jackson v. Brown</u>, 513 F.3d 1057, 1083-1084 (9th Cir. 2008)**

An investigator, Herman Roethel, testified on December 21, 1978, about his efforts to locate both witnesses. Roethel testified that on August 16, he was informed that the subpoenas sent to both Rushing and Lewis had been returned in the mail. Roethel visited Lewis's apartment but discovered it was vacant. He managed to contact her husband, who told Roethel that he had not seen his wife in some time but would instruct her to contact Roethel if he did. On September 29, Roethel followed up with her husband, who told him that Lewis was in custody awaiting a child custody hearing. While Lewis was in custody, Roethel personally served her with notice to appear in court on October 3; however, Jackson's trial was subsequently continued. Soon thereafter, the authorities learned that Lewis had several outstanding warrants under different aliases, so they held her in custody until October 20 for a prostitution charge. However, Roethel only learned of Lewis's aliases and prostitution after she had been released on bail, at which point he "lost touch with her." From then until December, Roethel repeatedly checked a system to see whether Lewis had been arrested under any of her aliases. Finally, Roethel contacted one of Lewis's friends, who indicated that she had been operating as a prostitute on a particular street corner. Roethel visited the corner several times, but was not able to locate her.

Roethel also testified about his attempts to locate Larry Rushing. Roethel first visited Rushing's parents' home. His sister told him that Rushing occasionally came by the house, so Roethel left a business card with her and instructed her to have Rushing contact him. Roethel called the house over the next few weeks, and Rushing's sister told him that she had given Rushing the card. On August 29, Roethel contacted an officer named Woodward at the L.A.P.D. who had been in contact with Rushing and who volunteered to contact him again. Roethel took no further action until December 21, when he returned to the parents' house to let them know Rushing would be needed the following week for trial; they said they would likely see Rushing over the holidays. Roethel again contacted Officer Woodward, who claimed that he had not had time to contact Rushing but that he would do so. On December 28, Woodward said he had still not had time and informed Roethel that Rushing was wanted on a warrant. Roethel then contacted Rushing's probation officer who confirmed Rushing's pending warrant and said that he had not reported in since June. Finally, Roethel obtained an address for Rushing and visited it several times but he was never there.

The trial court held that the investigator had made a reasonable, good-faith effort to secure the witnesses' presence and allowed the State to introduce the preliminary hearing testimony:

> I believe that the test is one of reasonable efforts to secure the attendance of the witness, and in making an evaluation *1084 of the efforts in this case, I am forced to consider the life-style of the people that the process server was seeking to serve.
>
> [Rushing] apparently is a fugitive from justice and the only inference I can get from the testimony is that he is hiding out. [Lewis] is apparently a prostitute, at least part-time prostitute, who goes by many aliases and would be extremely difficult to locate if, in fact, she didn't want to be located. I expect reasonable efforts to include the things the process server did in this case. I don't think you can ask him to perform superhuman efforts to locate witnesses such as these, and I think, under the circumstances, that he did make a diligent effort to serve them with subpoenas. Therefore, I will permit you to read the testimony of the two witnesses from the preliminary hearing.

The district court agreed with the state trial court's finding and therefore denied Jackson's claim for habeas relief: "Petitioner had an opportunity to cross-examine Lewis and Rushing at the preliminary hearing, and after making a good faith effort to secure their attendance at trial, the prosecution sufficiently established their unavailability."

We agree under the circumstances that the prosecution made a good-faith effort to procure Lewis's appearance. Roethel personally served Lewis while she was in custody, and she apparently would have been present to testify had the trial not been continued (Lewis remained in custody on the date of her originally scheduled appearance). After Lewis was released, Roethel repeatedly checked to see if Lewis had been booked under any of her aliases. Finally, once Roethel learned of the street corner where she was allegedly working, he repeatedly visited the corner to no avail. In light of Lewis's transience and the shifting trial dates, Roethel's efforts were reasonable.

In contrast, we find that Roethel's efforts to procure Rushing's appearance were insufficient to meet the unavailability requirement of the Confrontation Clause. The Sixth Amendment requires "good-faith efforts undertaken prior to trial to locate and present th[e] witness." *Ohio v. Roberts*, 448 U.S. 56, 74, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980) (emphasis added). At the time of Jackson's trial, California similarly recognized that the state was "required to show ... due diligence in attempting to locate [the witness] within a reasonable time before trial." *People v. Benjamin*, 3 Cal.App.3d 687, 696, 83 Cal.Rptr. 764 (1970) (emphasis added). Yet Roethel testified that he did absolutely nothing to locate Rushing between August 29 and December 21, several weeks into the trial. Instead, he relied exclusively on Officer Woodward to contact Rushing. During this time period, Woodward apparently made no effort to contact the witness because he was "too busy and he hadn't had really any time to check it out." Woodward's occupation with other matters cannot excuse the prosecution from the Sixth Amendment's requirement of good-faith

efforts. Moreover, it is irrelevant whether Roethel reasonably relied on Officer Woodward; Woodward was himself a state agent and was therefore no less responsible than Roethel for performing good-faith efforts to find Rushing.